UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

―――――

JAMES LEE DANIELS,                    )
                                      )
                    Petitioner,       )          Case No. 4:03-cv-57
                                      )
v.                                    )          Honorable Wendell A. Miles
                                      )
KURT JONES,                           )
                                      )
                    Respondent.       )
_____)

OPINION AND ORDER

      This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.

§ 2254.  Petitioner is serving a term of imprisonment of life without the possibility of parole,

imposed by the Calhoun County Circuit Court on January 24, 1997, after he was convicted of

first-degree murder, MICH. COMP. LAWS § 750.316, and possession of a firearm during the

commission of a felony, MICH. COMP. LAWS § 750.227BA.  Petitioner filed an amended petition

for habeas corpus relief on September 12, 2005 (docket #24).  In his amended *pro se* petition,

Petitioner raises the following ten grounds for habeas relief:

> I.     PETITIONER WAS DENIED DUE PROCESS OF LAW AND THE
> EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL DUE TO
> INCOMPLETE/INACCURATE TRANSCRIPTS OF THE LOWER
> COURT PROCEEDINGS.
>
> II.    PETITIONER'S CONVICTIONS FOR FIRST-DEGREE MURDER
> AND FELONY-FIREARM WERE NOT SUPPORTED BY
> SUFFICIENT EVIDENCE OF IDENTIFICATION CONNECTING
> PETITIONER WITH THE CRIME.

III.    PETITIONER WAS DEPRIVED OF HIS RIGHT TO DUE PROCESS OF LAW AND CONFRONTATION OF THE STATE'S EVIDENCE BY THE PROSECUTION'S WITHHOLDING OF EXCULPATORY SUBSTANTIVE EVIDENCE, WHERE THE PROSECUTION PRESENTED FALSE EVIDENCE TO THE JURY.

IV.    PETITIONER WAS DEPRIVED OF HIS RIGHT UNDER THE UNITED STATES CONSTITUTION AMENDMENT IV WHERE THE POLICE SEIZED PETITIONER'S PROPERTY PURSUANT TO A WARRANTLESS, NONCONSENSUAL SEARCH OF PETITIONER'S RESIDENCE AND CAR.

V.    PETITIONER'S CONVICTION SHOULD BE REVERSED BECAUSE THE TRIAL COURT FAILED TO PROPERLY INSTRUCT THE JURY AS TO PETITIONER'S SELF-REPRESENTATION.

VI.    PETITIONER'S CONVICTION SHOULD BE REVERSED BECAUSE HIS CONSTITUTIONAL GUARANTEES OF THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION WERE VIOLATED BY PROSECUTORIAL MISCONDUCT AND A DENIAL OF CONFRONTATION.

VII.    PETITIONER'S CONVICTION SHOULD BE REVERSED BECAUSE THE TRIAL COURT REFUSED PETITIONER'S REQUESTS FOR SUBSTITUTION OF COUNSEL, OR TO REPRESENT HIMSELF UNTIL TOO LATE IN THE PROCEEDINGS.

VIII.    PETITIONER'S CONVICTION SHOULD BE REVERSED BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO FIND FOR THE OFFENSE OF PREMEDITATED MURDER; ALTERNATIVELY, THE MOTION FOR DIRECTED VERDICT SHOULD HAVE BEEN GRANTED.

IX.    PETITIONER'S CONVICTION SHOULD BE REVERSED BECAUSE HIS ATTORNEY'S DEFICIENT PERFORMANCE DENIED BOTH HIS STATE AND FEDERAL CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF TRIAL AND APPELLATE COUNSEL.

X.    PETITIONER'S CONVICTION SHOULD BE VACATED, AND

PETITIONER IS ENTITLED TO IMMEDIATE RELEASE WHERE A GROSS MANIFEST OF INJUSTICE OCCURRED TO ONE WHOM IS ACTUALLY INNOCENT.

Respondent filed an answer to the petition (docket #31) contending that grounds I, II, III, IV, VI and X, and the claim of ineffective assistance of appellate counsel included in ground IX, should be denied as they are procedurally defaulted.  Respondent further contends that ground V is non-cognizable and procedurally defaulted, and ground VII and the claim of ineffective assistance of trial counsel in ground IX has no merit.  Because Petitioner filed his habeas application after the enactment of the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA), the provisions of that law govern the scope of the court's review.  See Penry v. Johnson, 532 U.S. 782, 791 (2001).  Upon review and applying the standards under the AEDPA, I find that Petitioner's claims either do not merit habeas corpus relief or are beyond the court's review because they are procedurally defaulted.  Accordingly, the petition shall be denied.

**Procedural History**

**A.      Trial Court Proceedings**

The state prosecution arose from the fatal shooting of Tiney Mae Mosher (Ms. Mosher) at her residence on the evening of March 29, 1993.  Ms. Mosher had a young son, Brandon.  She claimed Petitioner was Brandon's father, and Petitioner was paying child support.  Petitioner was charged with open murder and possession of a firearm during the commission of a felony in connection with Ms. Mosher's death.  He was tried before a jury on January 14, 1997 through January 24, 1997.

James Towery was living with Ms. Mosher and Brandon at the time of her death. When

3

Mr. Towery returned home at 11:15 p.m. on March 29, 1993, he found Ms. Mosher lying in the entry way, near the front door.  (Tr. II, 159)[1].  He testified that Ms. Mosher always locked the doors in the evening, and would not open the door to strangers. (Tr. II, 157).  Although Petitioner mentioned that he was unhappy about paying child support, (Tr. II, 156), Mr. Towery  testified that Petitioner would bring clothing and other items for Brandon to the house, and that Petitioner and Ms. Mosher were generally on friendly terms.  (Tr. II, 164).  He felt comfortable leaving the house when Petitioner was there. (Tr. II, 175).  Todd Hagist**,** the father of Brandon's older half-brother Aaron, also came to the house and paid child support.  Mr. Hagist and Ms. Mosher generally argued.  (Tr. II, 165).

Doctor Laurence Simpson testified that on March 31, 1993, he performed an autopsy on Ms. Mosher.  (Tr. II, 122 ).  Doctor Simpson observed a gunshot wound in Ms. Mosher's left shoulder and a second gunshot wound on the front of her chest. (Tr. II, 123 and 127).  The doctor was able to recover the bullets from both wounds, which he turned over to the police.  (Tr. II, 126 and 128).  Dr. Simpson concluded that the wounds were not self-inflicted.  (Tr. II, 130).

Battle Creek City Police Officer William Marry testified that he was the first officer on the scene.  (Tr. II, 178).  There were no sign of a struggle in the house. (Tr. II, 179).  In his search of the house, Officer Marry found one child sleeping downstairs, and three children and an adult sleeping upstairs. (Tr. II, 180).

---

[1]The trial transcripts are cited as follows:
        January 14, 1997, docket # 45 - Tr. I
        January 15, 1997, docket #46 -  Tr. II
        January 16, 1997, docket #47 -  Tr. III
        January 17, 1997, docket #48 -  Tr. IV
        January 21, 1997, docket #49 -  Tr. V
        January 22, 1997, docket #50 -  Tr. VI
        January 23, 1997, docket #51 -  Tr. VII
        January 24, 1997, docket #52 -  Tr. VIII

Detective Dennis Mullen testified that he was not able to verify Petitioner's alibi.   He found that Petitioner had made inconsistent statements.  (Tr. III, 42).  Police searched Petitioner's house and seized a pair of brown western boots which appeared to have blood stains on them. (Tr. III, 46, 50).  Petitioner acknowledged the boots belonged to him, (Tr. VI., 73), and claimed they were his hunting boots. (Tr. VI, 78).   Detective Mullen attended Ms. Mosher's funeral service.  He stated that at the conclusion of the eulogy, Petitioner approached the casket, placed his hands on the casket, stated "I'm sorry," and left the funeral home. (Tr. III, 48).

Michael VanStratton, the supervisor of the Battle Creek Police Department Crime Laboratory who had been trained in blood stain pattern interpretation (Tr. V. 196), testified that when he arrived at the crime scene, he observed a noticeable amount of blood on the entry door (Tr. V., 191), and around the front door area. (Tr. V., 195).  He observed blood stains on the victim's left hand; stains from blood flowing from her nose and mouth; and blood stains around her mouth and cheek.  (Tr. V. 196). He testified that the blood stains on the door were likely projectile stains from the victim's mouth and nose.  (Tr. V., 202).  The door had to be slightly open when the blood stains were made.  (Tr. V., 203).  There were no signs of a struggle. (Tr. V., 206).  Officer VanStratton also participated in the search of Petitioner's residence, where he discovered western boots with blood stains, (Tr. V., 211), and a .32 caliber cartridge in a dresser drawer (Tr. VI., 26).  Larry Viers testified that Petitioner owned a 38 caliber, snub nosed gun (Tr. IV, 86-7).

Marie Bard-Curtis, of the Forensic Science Division of the Michigan State Police, testified that the victim's blood and the blood stain on the western boots were the same blood type.  (Tr. VI., 42).  Meghan Clement, of the forensic identity testing division at Laboratory

Corporation of America,  (Tr. V, 51), tested samples of blood from Petitioner and Ms. Mosher, and the blood from the western boots found at Petitioner's home.  She testified that the blood on the boots was consistent with originating from a female, (Tr. V, 68), and Ms. Mosher could not be ruled out as its contributor. (Tr. V, 72, 74).  Ms. Clement further testified that the probability of randomly selecting an unrelated individual with a DNA profile consistent with the stain from the left boot and Ms. Mosher was approximately one in sixteen million.  (Tr. V., 76).

A Michigan State Police ballistic expert, Robert Cilwa, testified that the bullet and bullet fragment from the crime scene were consistent with a .32 caliber bullet (TR. V, 182), and were fired from the same revolver. (Tr. V, 175, 177).

Thor Hooper testified he was a good friend of Ms. Mosher, and at the time of her death was living in her basement. (Tr. IV, 7).  He spent the afternoon of March 29 at Jack Peterson's home working on his motorcycle.  In the evening he, Mr. Peterson, and Mr. Peterson's girlfriend went to a motorcycle club.  Upon returning to Mr. Peterson's home, the two men had a physical fight.  Later, he received a telephone call from Mr. Towery informing him that Ms. Mosher had been beaten.  (Tr. IV., 11).  Mr. Hooper returned to Ms. Mosher's home.  He testified that the blood spots on his shirt and the scratches on his neck that night were the result of the earlier fight with Mr. Peterson.

Jack Peterson testified that Mr. Peterson and Mr. Hooper met at approximately two in the afternoon on the day of Ms. Mosher's death.  (Tr. III, 9).  After working on their motorcycles during the afternoon, they went to the bar at a motorcycle clubhouse, along with Mr. Peterson's girlfriend. (Tr. III, 6, 10).  The party eventually returned to Mr. Peterson's home.  Mr. Peterson and Mr. Hooper had a fight, and Mr. Peterson punched Mr. Hooper a couple of times.  (Tr. III,

7).  After receiving a telephone call from Mr. Towery reporting Ms. Mosher's death, Mr. Peterson drove Mr. Hooper home. (Tr. III, 8).  The testimony of Mr. Peterson's girlfriend, Brenda Elliot, was essentially the same as that of Mr. Peterson.  (Tr. III, 14-23).

Raymond Kennada testified that he had been Petitioner's friend since 1991.  In 1992, Petitioner told Mr. Kennada that despite DNA test results, he was not Brandon's father.  (Tr. IV, 89).  He also told Mr. Kennada that he would like to get rid of Ms. Mosher. (Tr. IV, 90). Petitioner later accepted Brandon as his son, and began paying child support.  (Tr. IV, 93-4).

Detective Mullens testified that he interviewed sixty to seventy people regarding the case. (Tr. III, 38).  He was able to excluded as suspects Mr. Towery, Mr. Hooper, and Mr. Hagist, as their alibis were verified. (Tr. III, 39-40).  Detective Mullens also verified the alibi of a fourth suspect, Mark Shortridge (Tr. III, 41).

Eric Askew testified that he was employed by the City of Battle Creek, had known Petitioner for many years, and occasionally worked with him.  (Tr. VII., 35).  He testified that Petitioner told him that despite the DNA testing that had been done, Brandon was not his child. (Tr. VII, 37).  In February 1993, Petitioner was "furious" that child support had been deducted from his paycheck, and stated that, "she had signed her death warrant, that he may not get her today, he may not get her tomorrow, but he was going to get her."  (Tr. VII., 39).  Mr. Askew further testified as follows:

> he went on and on and on about it. . . . He would come up with another way of killing her.  He would go on about how he would set the house on fire some night when they had gone to sleep, killing the woman and child, then he went on about finding some way where – some method to entice her and the child into the car and possibly killing them, shooting them, disposing of the bodies, he just went on and on and on.

(Tr. VII., 39-40).  Mr. Askew also testified that Petitioner generally wore brown cowboy boots.

(Tr. VII., 43).

Robert Bank testified that he and Petitioner were very close friends.  March 29 was Petitioner's birthday, and Mr. Bank expected Petitioner to come to his house after work, but he did not.  (Tr. VII., 69-70).  When he questioned Petitioner the following day, Petitioner stated that he had stayed home and drank because he was depressed.  (Tr. VII., 71).  Petitioner was upset about having to pay child support,  (Tr. VII., 76), and upset by Ms. Mosher's death.  (Tr. VIII., 97).  Mr. Banks never knew Petitioner to have a .32 caliber weapon.  (Tr. VIII., 97).

Patricia Jenks testified that she was employed at the Victory Lane Bar, where Petitioner was a regular customer.  She testified that Petitioner came into the bar on March 29, 1993, between 10:30 and 11:00 p.m.  He was dressed better than usual, was unusually quiet while at the bar, and stayed only a short time.  (Tr. VII, 13-14).

Willie Sanchez, who was employed by the City of Battle Creek, was working near the crime scene on the evening of March 29, 1993.  He observed Petitioner driving by.  Petitioner appeared to be in a hurry, as he failed to wave at his fellow city worker.  (Tr. VII., 28-30). Michael Sherzer testified for the defense.  Mr. Sherzer is employed by the Battle Creek Police Department.  Approximately one month after Ms. Mosher's death, he received a telephone call from an anonymous female who reported that there had been significant drug activity at Ms. Mosher's residence.  (Tr. VII., 95).  Officer Sherzer also testified that as a former member of the Special Investigation Unit, he would have been aware if Ms. Mosher's home was a drug house. To his knowledge, neither Ms. Mosher, James Towery nor Thor Hooper were drug dealers.  (Tr. VII, 98-99).

Ms. Mosher's older son, Aaron Hagist, who was seven at the time of his mother's death,

testified that he did not hear anything on the night of his mother's murder. (Tr. VII, 102). He denied having told a police officer in 1993, that he heard two shots on the night of his mother's death; that he had seen Thor Hooper standing in the living room while his mother was lying on the floor; or that Thor Hooper and a woman had threatened to hurt him if he said anything. (Tr. VII, 105-06).

Also testifying for the defense was James Boles, who knew Petitioner through his work as an employee of the City of Battle Creek. (Tr. VII, 109). He testified that Eric Askew had written a lengthy letter pertaining to Petitioner for police investigators, which included numerous false statements attributed to Mr. Boles. (Tr. VII, 111).

Delores Eggleston testified that she was a friend of Petitioners. In the summer of 1992, she went on a picnic at the lake with Petitioner and Ms. Mosher. Ms. Mosher cut her foot when she stepped on a piece of glass. (Tr. VIII, 100). The cut caused profuse bleeding. Petitioner picked Ms. Mosher up, placed her on a picnic table, and tried to stop the bleeding with his thumb. (Tr. VIII., 102). Petitioner was wearing cowboy boots. (Tr. VIII, 102).

On the final day of trial, Petitioner moved for leave to dismiss his attorney and represent himself. He argued that his attorney had "sabotaged the first two defense witnesses;" came to court unprepared; was ready to end the trial without calling certain witnesses; and ignored Petitioner's request for calling a handwriting expert as an expert witness. (Tr. VIII., 16). The trial court granted the motion and appointed trial counsel as stand-by counsel. (Tr. VIII, 51- 52). The trial court also thoroughly advised Petitioner concerning his responsibilities as his own attorney. (Tr. VIII, 32-75). The trial judge explained to the jury that Petitioner:

> has decided to represent himself for the remainder of the trial, he is
> going to do that, and [trial counsel] will be available to consult

9

with {Petitioner] should [Petitioner] so desire, but otherwise
[Petitioner] will be representing himself from this point forward and
we'll continue.

(Tr. VIII, 95).

The jury convicted Petitioner of first degree murder and possession of a firearm during

the commission of a felony.  The trial judge sentenced Petitioner to consecutive terms of

imprisonment of two years for the possession of a firearm conviction and life without the

possibility of parole on the first-degree conviction.

### B.  Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  The Michigan Court of

Appeals issued an unpublished opinion on April 24, 2001, affirming Petitioner's conviction.

(Apr. 24, 2001 Mich. Ct. of Appeals Op. (MCOA), docket #56.)  The Michigan Supreme Court

denied his delayed application for leave to appeal on February 4, 2002. (Feb. 4, 2002 Mich. Ord.,

docket #57.)

### C.  Post-Conviction Relief

On or about May 22, 2001, Petitioner filed a motion for production of trial exhibits in the

Calhoun County Circuit Court.  The motion was denied on June 20, 2001, because the trial court

found that Petitioner had failed to show how the exhibits would aid in his appeal and that turning

the exhibits over to Petitioner could put the exhibits at risk.  The Michigan Court of Appeals and

the Michigan Supreme Court denied Petitioner's applications for leave to appeal for the reason

that the grounds presented lacked merit.  (Respectively, November 29, 2001 (docket #58), and

July 22, 2002 (docket #59)).  Petitioner filed a second motion for leave to appeal, which the

Court of Appeals denied on August 13, 2003, and the Michigan Supreme Court denied on

October 25, 2004, pursuant to MCR. 6.508(D). (Docket #61).

### D. Federal Petition for Writ of Habeas Corpus

On April 15, 2003, Petitioner filed his petition for habeas corpus relief, which this court determined contained both exhausted and unexhausted claims. On December 29, 2003, the Court issued an order requiring Petitioner to submit an amended complaint or exhaust his claims in state court. (Docket #13). Petitioner chose to exhaust his claims in state court, and filed a motion for relief from judgment under MCR. 6.500 in the trial court. The trial court concluded the motion was a successive motion and returned it to Petitioner without filing. Petitioner's delayed application for leave to appeal was dismissed under MCR. 6.502(G)(1) by the Court of Appeals on July 30, 2004, and the Michigan Supreme Court on May 31, 2005. (Docket #63).

### <u>Standard of Review</u>

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. <u>Bell v. Cone</u>, 535 U.S. 685, 693-94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings,

and not the dicta, of the Supreme Court.  <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000); <u>Bailey</u>, 271 F.3d at 655.  This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law.  <u>Bailey</u>, 271 F.3d at 655; <u>Harris v. Stovall</u>, 212 F.3d 940, 943 (6th Cir. 2000).  Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final."  <u>Onifer v. Tyszkiewicz</u>, 255 F.3d 313, 318 (6th Cir. 2001).

A federal habeas court may not find a state adjudication to be unreasonable "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  <u>Williams</u>, 529 U.S. at 411; <u>accord Bell</u>, 535 U.S. at 699.  Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable."  <u>Williams</u>, 529 U.S. at 410.

### Discussion

### Claim V.  Jury instruction

Petitioner claims that the trial court failed to properly instruct the jury regarding Petitioner's self-representation on the final day of trial.  At trial, Petitioner did not request a specific jury instruction pertaining to his self-representation. Petitioner raised this issue before the Michigan Court of Appeals and the Michigan Supreme Court.  After noting that Petitioner had not preserved the issue for appellate review by objecting to the trial court's jury instructions, the Michigan Court of Appeals reviewed Petitioner's claim for plain error, and found none.  The court wrote that, "defendant has not cited any authority in support of his claim that the court's jury instruction was deficient and, therefore, has not demonstrated any plain error."  (Apr. 24,

2001 MCOP Op.)

Assuming this claim is reviewable by this Court, the claim has no merit.  The Supreme Court has ruled that  "the fact that [a jury] instruction was allegedly incorrect under state law is not a basis for habeas relief."  Estelle v. McGuire, 502 U.S. 62, 71 (1991).   A claim that a trial court gave an improper jury instruction is not cognizable on habeas review unless the petitioner shows that the erroneous instruction "so infected the entire trial that the resulting conviction violates due process."  Henderson v. Kibbe, 431 U.S. 145, 155 (1977); see also Estelle, 502 U.S. at 75 (erroneous jury instructions may not serve as the basis for habeas relief unless they have "so infused the trial with unfairness as to deny due process of law"); Poindexter v. Mitchell, 454 F.3d 564, 586 (6th Cir. 2006) (same).  If a petitioner fails to meet this burden, he fails to show that the omission of a jury instruction violated his right to due process.  Id.

After Petitioner dismissed his attorney and was granted leave to represent himself, the trial court advised the jury that Petitioner had decided to represent himself.  Petitioner did not request a specific jury instruction, nor has he indicated what instruction the trial court should have given.  He does not contend that the jury instructions that were given incorrectly stated the substantive law of Michigan.  The trial court's simple explanation served to foreclose any adverse inferences that the jury might make about Petitioner's self-representation on the last day of trial.  Accordingly, the court concludes that Petitioner has not established that the failure to instruct the jury on Petitioner's self representation "so infused the trial with unfairness as to deny due process."  Thus, the court does not find that the state court's decision "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a

13

decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

### Claim VII - Substitution of  counsel

Plaintiff's seventh claim for relief is that the trial court should have either appointed substitute counsel or allowed him to represent himself at an earlier stage of the trial.  The Michigan Court of Appeals found that when Petitioner complained about his counsel's representation, "the trial court fully investigated defendant's complaints and found them to be without merit."   (Apr. 24, 2001 MCOP Op.)  The Court noted that at Petitioner's first request, the trial court made the proper inquiry, and when the issue arose a second time, the trial court granted the motion.

The Sixth Amendment guarantees a criminal defendant the right to assistance of counsel. King v. Bobby, 433 F.3d 483, 490 (6th Cir. 2006) (citing United States v. Wade, 388 U.S. 218, 224 (1967).  This right, however, is not absolute.  In both Powell v. Alabama, 287 U.S. 45, 53 (1932) and United States v. Gonzalez-Lopez, 548 U.S. 140 (2006), the Supreme Court explained that a criminal defendant who retains and pays for an attorney has the right to select the attorney of his or her choice.  However, it is well established that the Sixth Amendment does not entitle an indigent defendant to counsel of his choice.  Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 624 (1989); Morris v. Slappy, 461 U.S. 1, 14 (1983); Wilson v. Mintzes, 761 F.2d 275, 280 (6th Cir. 1985).

 The Sixth Amendment also guarantees defendants the right to represent themselves at trial.  Fayetta v. California, 422 U.S. 806, 819-20 (1975).  Because criminal defendants will likely fare better with the assistance of counsel than without, a defendant will be permitted to

14

represent himself only when he "knowingly and intelligently" relinquishes his right to counsel. <u>Id.</u> At 835.  For a waiver to be effective, the defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record with establish that 'he knows what he is doing and his choice is made with eyes open.'" <u>Id.</u> At 835, quoting <u>Adams v. United States ex rel. McCann</u>, 317 U.S. 269, 279 (1942).

      Prior to trial, Petitioner moved to remove his trial counsel and for leave to represent himself, as well as filed a grievance with the Attorney Grievance Commission.  At the hearing on Petitioner's motions, he presented a written response stating that he was satisfied with trial counsel's performance, and specifically requesting that trial counsel continue representing him. (Hr. Tr., Oct. 14, 1996 at 9-11, docket #42).  The grievance was later dismissed, as was Petitioner's second grievance, filed after the October 1996 hearing.  A week before trial, Petitioner again requested that trial counsel be dismissed.  Petitioner complained that counsel had not included three potential witness.  A lengthy questioning by the court revealed that counsel had earlier contacted the  potential witnesses, but the private investigator could no longer locate two of them.  (Mt. Tr., Jan. 7, 1997, 12-16, docket #44).  The third person was on the witness list.  (<u>Id.</u> at 21).  Petitioner also argued that trial counsel had failed to keep information confidential as he told several people in the courthouse that Petitioner wanted a bench trial although Petitioner had only mentioned this briefly.  The trial court found this was not confidential information because until a waiver of right to a jury trial is on the record, the mere possibility of a bench trial has no legal significance. (<u>Id.</u> at 36).  He argued that counsel should have filed a motion to suppress his statements made to police before he received his <u>Miranda</u> warnings, although he conceded that when he made the statements he was not in

custody or under arrest.  (Id. at 48-51).  Finally, he argued that counsel should have filed a motion to suppress evidence seized from his home because he had not consented to the search of his home. (Id. at 47).  He admitted that he had not informed counsel of the purported forged signature on the search consent form until the day of the hearing.  (Id. at 45, 47).  After questioning both Petitioner and trial counsel, the court concluded that there was not a breakdown in the attorney-client relationship in the legal sense but it appeared that Petitioner simply did not like what his counsel was telling him.  (Id. at 58.)  On the final day of trial, Petitioner informed the court that his counsel was not presenting an effective defense, and that he wished to represent himself.  The court questioned Petitioner at length and concluded that Petitioner was competent to represent himself, and that he was unequivocal in his waiver of counsel, and granted Petitioner's request. (Id. at 57-58).  The court does not find that the state court's decision was either contrary to clearly established Federal law or was based upon an unreasonable determination of the facts in light of the evidence of record.

<u>Grounds II and VIII - Sufficiency of the evidence</u>

As his second ground for relief, Petitioner claims that his convictions for first degree murder and felony-firearm were not supported by sufficient evidence connecting Petitioner with the crime.  As his eighth ground for relief, Petitioner claims there was insufficient evidence to find premeditated murder.

The Due Process Clause of the Fourteenth Amendment prohibits the criminal conviction of any person except upon proof of guilt beyond a reasonable doubt.  <u>In re Winship</u>, 397 U.S. 358 (1970).  Petitioner's federal constitutional challenge to the sufficiency of the evidence is governed by the standards set forth by the Supreme Court in <u>Jackson v. Virginia</u>, 443 U.S. 307,

319 (1979), which is "whether, after viewing the evidence in the light most favorable to the

prosecution, any rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt."  This standard of review recognizes the trier of fact's responsibility

to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable

inferences from basic facts to ultimate facts.  Id.  Issues of credibility may not be reviewed by

the habeas court under this standard.  See Herrera v. Collins, 506 U.S. 390, 401-02 (1993).  The

court presumes that the factual findings made by the state court are correct, see § 2254(e)(1),

unless the petitioner rebuts the presumption with clear and convincing evidence.  Warren v.

Smith, 161 F.3d 358, 360 (6th Cir. 1998).  The habeas court is required to examine the evidence

supporting the conviction, in the light most favorable to the prosecution, with specific reference

to the elements of the crime as established by state law.  Jackson, 443 U.S. at 324 n.16; Allen v.

Redman, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

Petitioner was convicted of first-degree murder in violation of MICH. COMP. LAWS §

750.316.  The statute provides in relevant part:

> (1) A person who commits any of the following is guilty of first degree
> murder and shall be punished by imprisonment for life:
> (A) Murder perpetrated by means of poison, lying in wait, or any
> other willful, deliberate, and premeditated killing.

The Michigan Court of Appeals found that the prosecution presented sufficient evidence

at trial to enable a rational trier of fact to conclude that the elements of premeditation and

deliberation had been proven beyond a reasonable doubt.  The court found the following

significant:

> The prosecution presented evidence that defendant was upset with the
> victim because he had to pay child support for the victim's child, that
> defendant told a friend he wanted to get rid of the victim, and that

17

> defendant detailed a plan for killing the victim to a coworker.  In addition,
> evidence indicated that the victim's blood was found on defendant's
> boots, that bullets recovered from defendant's hose were of the same
> type used to shoot the victim, and that defendant was overheard
> apologizing to the victim at the victim's funeral.  Viewed most favorably
> to the prosecution, the evidence was sufficient to enable a rational trier
> of fact to find beyond a reasonable doubt that defendant killed the
> victim and did so with premeditation and deliberation.

(Apr. 24, 2001 MCOA Op.).  This court also notes that Petitioner made inconsistent statements

to the police, and the police could not confirm his alibi.  Further, the victim was shot in the

entryway of her home and there was no evidence of a struggle before she was shot.  Applying the

standard set by the United States Supreme Court for analyzing a sufficiency of the evidence

challenge, the court concludes that the facts, supported by the record, provide sufficient evidence

for a rational trier of fact to find that Petitioner formed a premeditated and deliberate intent to

kill.  While Petitioner points out that there was other inconsistent testimony that might raise a

reasonable doubt, it is the jury's province, and not this court's, to determine the credibility of

each witness.  The finding that the evidence was sufficient to submit the issue to the jury was not

an unreasonable application of federal law to the facts presented at trial, and habeas relief must

accordingly be denied on this issue.

### Claim IX - Ineffective assistance of trial counsel

Petitioner claims that he received ineffective assistance of counsel at his trial.  His

complaints are that trial counsel failed to consult with him prior to and during trial; failed to

obtain complete discovery; failed to hire an handwriting expert to refute a consent to search

purportedly signed by Petitioner; and failed to file a motion for DNA testing of boots seized

from his residence.  In Strickland v. Washington, 466 U.S. 668, 687-88  (1984), the Supreme

Court established a two-prong test by which to evaluate claims of ineffective assistance of

18

counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  Id. (citing Michel v. Louisiana, 350 U.S. 91, 101 (1955)); see also Nagi v. United States, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  Id. at 691.  A claim of ineffective assistance of counsel presents a mixed question of law and fact.  Accordingly, the Court must apply the "unreasonable application" prong of § 2254(d)(1).  Barnes v. Elo, 339 F.3d 496, 501 (6th Cir. 2003).  "When deciding ineffective-assistance claims, courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'"  Campbell v. United States, 364 F.3d 727, 730 (6th Cir. 2004) (quoting Strickland, 466 U.S. at 697).

The Michigan Court of Appeals applied the Strickland test and concluded that Petitioner had not satisfied either the performance or the prejudice prongs of the test, reasoning that "[a]lthough defendant complained numerous times about counsel's representation, the record

discloses that defendant's complaints were either meritless or involved matters of trial strategy that we will not second-guess." (Apr. 24, 2001 MCOA Op.)  As discussed above under Claim VII, Petitioner raised several complaints regarding his trial counsel with the trial court.  The trial judge allowed ample time for Petitioner to explain the basis for his complaints, and found each to be without merit.  Petitioner complained about counsel's failure to call three witnesses although two could not be located and one was actually on the witness list.  He complained of statements made by trial counsel to courthouse personnel indicating Petitioner was considering a bench trial, but failed to demonstrate any prejudice that may have resulted.  He acknowledged that he made statements to police when he was not in custody or under arrest which could not be suppressed for lack of <u>Miranda</u> warnings.  Finally, he complained that trial counsel failed to pursue his assertion that his signature on the consent to search form was a forgery.  He conceded, however, that he had not informed trial counsel of this claim until the hearing on his motion to dismiss trial counsel.  Moreover, contrary to Petitioner's assertion, trial counsel engaged in discovery including a pre-trial motion to compel production.  The trial court questioned Petitioner and counsel at length regarding his complaints, and found the complaints were unsupported.  Based upon a review of the record, the court concludes that trial counsel's performance was not objectively unreasonable, and the Michigan Court of Appeals' decision was, therefore, a reasonable application of the <u>Strickland</u> test.

<u>Procedurally defaulted claims</u>

The court may not address the remainder of Petitioner's claims because they are procedurally defaulted.  When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus

review.  See Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991); Engle v. Isaac, 456 U.S. 107

(1982).  To determine whether a petitioner procedurally defaulted a federal claim in state court,

the Court must consider whether: (1) the petitioner failed to comply with an applicable state

procedural rule; (2) the last state court rendering judgment on the claim at issue actually

enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is

an "independent and adequate" state ground properly foreclosing federal habeas review of the

federal constitutional claim.  Hicks v. Straub, 377 F.3d 538, 551 (6th Cir. 2004); accord Lancaster

v. Adams, 324 F.3d 423, 436-37 (6th Cir. 2003); Greer v. Mitchell, 264 F.3d 663, 672 (6th Cir.

2001); Buell v. Mitchell, 274 F.3d 337, 348 (6th Cir. 2001).

      A state law procedural rule is adequate and independent when it was "firmly established

and regularly followed" at the time of the asserted procedural default.  Rogers v. Howes, 144

F.3d 990, 992 (6th Cir. 1998) (citing Ford v. Georgia, 498 U.S. 411, 423-24 (1991)).  Although

there may be an "exceptional case in which exorbitant application of a generally sound rule

renders the state ground inadequate to stop consideration of a federal question," Lee v. Kemna,

534 U.S. 362, 376 (2002), this case does not fall within that "limited category."  Id.

      Here, Petitioner raised these claims in his motion for relief from judgment, filed at the

direction of this court in order to exhaust the claims.  The Michigan Supreme Court expressly

stated that it denied Petitioner's application for leave to appeal on the basis that Petitioner failed

to "meet the burden of establishing entitlement to relief under M.C.R. 6.508(D)."  Under MICH.

CT. R. 6.508(D)(2) and (3), a defendant may not collaterally attack a conviction based upon

claims that were decided against him in a prior appeal or that could have been raised on direct

appeal.  In assessing how "firmly" a state procedural rule has been established, the critical

inquiry is whether, viewed from the time of the petitioner's later significant actions or inaction, the petitioner could be deemed to have been apprised of the procedural rule's existence.  Luberda v. Trippett, 211 F.3d 1004, 1006-07 (6th Cir. 2000).  Because MICH. CT. R. 6.508(D) was enacted in 1989 and Petitioner's conviction and appeals took place some time thereafter, MICH. CT. R. 6.508(D) was a "firmly established" procedural rule for purposes of Petitioner's action.  See Luberda, 211 F.3d at 1007; Rogers v. Howes, 144 F.3d 990, 994 (6th Cir. 1998).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice.  See House v. Bell, 547 U.S. 518, 536 (2006); Murray v. Carrier, 477 U.S. 478, 495 (1986); Hicks, 377 F.3d at 551-52.  The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence.  House, 547 U.S. at 536.  A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.  Id. (citing Schlup v. Delo, 513 U.S. 298, 327 (1995)).  Although Petitioner claims he is actually innocent, he has provided no competent new evidence to support this claim.

To the extent Petitioner is contending that the procedurally defaulted claim of ineffective assistance of appellate counsel is "cause" for the other defaulted claims, he must first meet the "cause" and "prejudice" standard for the claim of ineffective assistance of appellate counsel itself, see Edwards, 529 U.S. at 453; Lancaster v. Adams, 324 F.3d 423, 436-37 (6th Cir. 2003),

22

which he has not done.  Nor has he established cause for failing to raise the issues on direct appeal.  Thus, as a result of his unexcused procedural defaults, the grounds for relief presented in Claims I, III, IV, V, VI,  X and the ineffective assistance of appellate counsel portion of Claim IX in his habeas corpus petition may not be considered on federal habeas corpus review.

## Conclusion

For the foregoing reasons, Petitioner's Amended Petition for Habeas Corpus Relief (docket #24) is DENIED.

So ordered this 16th day of December, 2008.

 /s/ Wendell A. Miles 
Wendell A. Miles
Senior U.S. District Judge